GERALD PETERS Morning, Your Honors. Gerald Peters for the appellant. Paul Kent. I'm accompanied by Gary Tisch, who is Mr. Kent's attorney at the trial court level, and Mr. Kent is also present. GARY TISCH It's always tough to be the last on the calendar, so I appreciate your patience. GERALD PETERS It's been a bit of a wait now. I should begin with a discussion of the standard of review, although that is not really critical, because I think that the district court should be reversed under either the abuse of discretion or a heightened standard caused by Provident-Unum's conflict of interest. But starting first with the standard of review, the critical question is the trial court's refusal to consider the hand-guarded decision which was handed down by a district court in 2002 and which was affirmed by the Ninth Circuit in 2004. The district court found that Unum-Provident and its subsidiary, a different subsidiary at that time, Paul Revere, had engaged in a company-wide practice systemic bias. Kagan. Do you think it's part of the same time period that we're talking about here? PETERS Yes, it is, Your Honor. The hand-guarded claim was denied in May of 2000 to May of 1999. Mr. Kent's claim was denied in April of 2001, less than two years later. And I'd also point out that the answer is no, it wasn't the same time period. PETERS It was within two years, Your Honor. Kagan. But everything could have changed by then. PETERS Well, it could have, except that the hand-guarded decision itself didn't come down until 2002, which was subsequent to the denial of Mr. Kent's claim. And as an aside, I'd point out that three cases that I've cited from various states across the country, all involving Dr. Hashway, all involving similar issues, were all decided by the district courts in 2002. That's Cunningham, Shipps, and Lasser, indicating to me that those arose out of  And I'd also point out that the hand-guarded decision itself didn't come down until May of 2001. Kagan. Did you try to introduce any external evidence with regard to the conflict question? PETERS The evidence was the hand-guarded decision. Kagan. Anything else? PETERS No, Your Honor. Kagan. Such as any information directly pertinent to the question of whether stress is a risk factor for heart conditions or where? PETERS Just the medical records of Dr. Tavick and the later of Dr. Brotbauer. I mean, what you really have here, Your Honor, is the fact that this is sort of playing on the administrator's home turf. The doctors know what to put in their reports. They know what is going to be looked at by the district court and eventually by the court of appeal. The treating physician, on the other hand, scribbles a few notes, writes a few things down, uses a few initials, a few acronyms, and thinks that's good enough. And so you're sort of fighting uphill from the beginning because you don't really have equal experts on the opposing sides. The provident unum experts on the opposing sides. Kagan. Kagan. So my understanding of that are very odd, what I regard as very odd law on the conflict question, is that if you had come in with external evidence demonstrating that Dr. Hashway, for example, was just off the wall in terms of, and I'm not saying he was, but if you came up with this evidence, that his opinion with regard to the very serious heart condition was just, you know, contrary to all kinds of available evidence, that would be relevant evidence with regard to the conflict question under our law, would it not? That would be relevant evidence. But he didn't do that. That was not done, Your Honor. I'm not sure how you would explain that. So the result is that we have no external evidence. Well, no, Your Honor. We can't switch to judge his opinion. Well, there's also the question of whose burden it should be. I think within this country you have a general public sentiment and understanding that there is a causal relationship or link between stress and job stress and coronary heart disease. I think that is generally accepted by the American public and by medical doctors. There's Dr. Hashway and Providen-Unum, which is fighting upstream. I think it should be their burden to demonstrate their claim, as in fact was done by the Third Circuit in a recent case, Lasser v. Reliance Standard, a 2003 Third Circuit case. The administrator is the one who has the capacity to put together that sort of information and let them do it. Do they have the ---- But the plan here says that it's his burden. It's Kent's burden. Well, it doesn't say it has his burden to provide scientific evidence to denigrate their minority position that there's no relationship between cardiac disease and job stress. Providen-Unum, I think in the definite minority, I think it should be their burden to show that there is some basis for that opinion. And what do you base that position on? Again, I'm referring to the Lasser v. Reliance Standard case, 344F381, which takes that position that it's the administrator's burden because they have the greater resources and the greater capacity to put together that sort of medical evidence. And what circuit is that from? That's Third Circuit, Your Honor. Third Circuit. Third Circuit. Well, that's not binding on us, so why should we adopt it? No, it isn't. The point really about Hangard is that it explains the handling of this case. And what has effectively happened is that by creating an artificially low standard for not being disabled, meaning reliance on the sedentary task test, Providen-Unum has essentially disqualified an entire class of people from ever being able to get disability benefits. No professional who suffers from cardiac disease could ever qualify for benefits under their claim because they say if you can lift up 10 pounds, you can do sedentary work. And being an attorney or being a judge is sedentary work, and therefore, you're not disabled. And I went last night and I said, what weighs 10 pounds? And I actually put my note, my briefcase right there and had the administrative record in it and put it on a scale, and that weighed 10 pounds. So if I can pick up that briefcase under Providen-Unum's definition, I'm not disqualified. If I have cardiac disease, no matter how severe, if I can lift up that briefcase, I'm good to go. In fact, my 81-year-old father-in-law, who's had heart disease for 20 years or so, who's now breathing 24-7 on oxygen, could probably pick up that briefcase. But here there's other evidence. I mean, beside there's your client was overweight. Yes. Had smoked for a number of years. Yes. Had drunk alcoholic beverages. Probably not within the past 20 years, Your Honor. Pardon me? I don't think there's any evidence that that was relevant to the current medical condition, and I'm not sure that that's really relevant anyway as to whether he is suffering from a permanent disability. The question is whether he is. The question is what? The stress? Is that it, that the stress at work? He can't perform his job because of factors that he created. No. No, Your Honor. Well, even if that was relevant, which I don't think it is, I don't think that's true. That's sort of a blaming the victim approach to disability insurance, I guess. But smoking has some effect on cardiac health, does it not? Yes. There's no evidence, though, that in this case smoking had anything to do with his cardiac health, and there's nothing in the record to indicate that he had smoked within the last 10 years or so. Was there also evidence of hypertension? Yes. What did the company doctor do, Hashway, do with regard to that? Nothing, really. All they did was said based on his treadmill test, he can meet the requirements of a sedentary job, and that was the end of the analysis. So, for example, when Dr. Hashway said that there was that stress was not a recognized proven stress risk factor, he did recognize that hypertension was a recognized risk factor. Right. And he also said there was a – And what does the record show specifically with regard to his hypertension? I believe Dr. Tabak's initial diagnosis says hypertension. If you take a look, he had an elevated high blood pressure throughout the entire history. It was usually, I think, about 150 over 90. There was evidence of hypertension for years, and there was a list of medicines that he was taking under doctor prescription, which I assume included high blood pressure medication. There was no investigation of that. The only issue was really whether he could lift a – based upon his last treadmill test, he could lift up a 10-pound weight. And they referred repeatedly to whether he could perform a sedentary task, a sedentary profession. And that, as best I can understand it, comes from the definitions used by Social Security and the Department of Transportation. The 20 CFR 416967, it defines sedentary work, and it says it involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools, although a sedentary job is defined as one which involves sitting a certain amount of walking and standing as often necessary and carrying out job duties. That was the definition they applied to determine whether he could perform his job duties. They never actually made any attempt to find out what his job duties were. As the Court will notice, the only description of Mr. Penn's job duties was in his initial claimant statement. He gave a brief statement of his job duties. Dr. I'm trying to remember the correct pronunciation, Takbauer, or Tabak, in a second appeal which was initiated by Mr. Penn's employer, CIBC, Dr. Bratbauer, my mistake, gave a lengthier description of his employment duties. There is nothing to indicate that any of those duties were ever considered by Providence. Kagan. Well, there's nothing to indicate they weren't either. I mean, they were before the administrator. They were before the administrator. They were purported to be making a decision based on own occupation. Correct. So we can't really prove they weren't. They weren't using them. Well, correct, but I think to correctly determine if he was disabled, they were required to actually analyze what his job duties were and compare them to his physical capacity. And the fact that he could Well, but if you buy their basic story, which is the doctor's basic story, which is that stress isn't a job, job stress isn't a risk factor, then the details don't matter. So basically we have to judge that. Why would the details matter? I mean, his job, whatever it was, was not a physical job. Correct. So, therefore, exactly what he had to do only matters if you're If we don't need to defer to this statement about stress not being a risk factor. Well, that's actually only partially true because my recollection is Dr. Hashway actually recognizes that it's commonly accepted that there is a correlation between stress and But he makes the decision on the basis that, as I understood it, he understands it's commonly accepted, but he says it's not, there's no proof of it and, therefore, I don't have to rely on it. Then that's, it seems to me, the crux of this case. Does he or doesn't he? And is it an abuse of discretion for him to disregard this guy's doctor's opinions that it does matter? The details of the job don't matter here because if Dr. Hashway's opinion was not based on the particular the fact that he wasn't under stress in his job, it was that it didn't matter if he was under stress in his job. Well, let me back up one thing. There is some question I think raised by the record as to what extent these decisions were actually made by Dr. Hashway. In both instances in which he made a decision, there was actually a prior review and analysis by a nurse. In the first instance, the analysis was by Nurse Darla Lawson, who had, I believe, two years of experience, who did a pure, based upon his treadmill test, he's good to go. Dr. Hashway did a one-line concurrence. You're right. But the second time, he does seem to have engaged. Well, that is true. But once again, his analysis was prescreened by a nurse, Brenda Dunn, who gave him her two-page analysis. This is a person who had, I think, eight years of experience as a nurse, about four of which appeared to be hospital-related. So he's already been preconditioned by the nurse's analysis to come to a conclusion. And the nurse is the person who does the primary analysis. And what the nurse does in both instances is Nurse Lawson essentially says, oh, I don't buy what Dr. Tavich says, even though he's a board-certified cardiologist. And Nurse Dunn says, I don't believe Dr. Brachbauer's opinion, even though he's a certified cardiologist and he's also on the faculty at USC School of Medicine. I, as a nurse, can override his opinion because I know better than he does. Isn't that of itself an abusive discretion to give that decision-making power in the first instance to a person who has rather dubious qualifications for making that decision? Kagan. Well, it might be if she stood alone, but she didn't stand alone. And so the real problem is whether Dr. Hashway can reject a correlation that the physician saw and that one might be able to assume most physicians would see because it wasn't sufficiently scientifically proven. Isn't that really where we are? Well, there's that, but there's also the broader question of whether Unimprovement can adopt a policy which essentially disqualifies most claimants because if a claimant can lift up a 10-pound bag, they're not disabled. If their claim is cardiac disease, they're not disabled. You're saying basically the same thing I'm saying, I think. Well, no, because you're talking about the correlation between stress and heart disease, and I agree on that point. But a second point is, isn't that determination that you're supposed to, you measure a person's capacity who's got significant cardiac disease solely by his ability to pick up a 10-pound bag, isn't that of itself an abuse of discretion? And isn't this all evidence of a scheme as found by the Disciplinary Handbook?  This individual has had a long history of building up plaque or whatever it is that closes up the arteries, and he's had problems over the years. But at the moment, there's no evidence that there's anything wrong with his arteries. So the real issue is what likelihood is that the cycle that has appeared in the past is going to appear again if he continues to work? That's really the question, right? Because as of the moment, he can not only pick up 10 pounds, he can probably run 10 miles. But that's not the question. Well, I'm not sure that he can run 10 miles, but I'm sure you're being facetious. But let me respond to that in two ways, which is even before Mr. Kent had his surgery, Unum Providence was already looking to deny. There were three references in Unum Providence records dated the week before he had surgery. And I can give the Court the references that are pointed out in the brief. On 285, the transcript on pages 285, 289, 290, and 315 all reflect before he had his surgery, the stents implanted, Unum Providence is saying, what objective evidence is there that this guy can't perform his job? And this is a man who is scheduled to have surgery in one week. If I look further, I can find the dates of those. It's June 15th and June 26th and June 27th. Those are all internal memorandum questioning whether Mr. Kent was even disabled, notwithstanding the surgery. So it seems to me that they were set up for a denial. And it seems to me this all fits together with the scheme found in Hangarter. And let me point out that the Ninth Circuit, when it affirmed the Hangarter district court decision, specifically found that there was substantial evidence to find that Unum Providence had a company-wide scheme to deny claims. And if I recall correctly, the Hangarter decision specifically pointed to the fact that this scheme involved claims arising in California. I don't think it's too much to put together the fact that there is a finding in the case. I just have real problems with the time difference. I mean, I understand that the agreement wasn't the case wasn't out yet, but we'd have to just leap an assumption. We'd have to assume that whatever they were doing in 99, they were still doing in 2001. And we don't have any evidence of that. Well, we don't have any evidence to the contrary. I understand that. But we don't have any evidence that they were. Well, let me just sort of take a bit of a leap, then, and this will evidence the fact that I do some criminal law and I'm primarily a State court practitioner. But if we were looking at this as a criminal matter, we would be looking and saying other crimes evidence under California law. I understand that. But we might – I mean, a very good assumption would be if they had any brains, they stopped doing it after they were sued. Maybe they didn't, but pretty good legal advice if they were sued. Well, we assume that things continue on as they have been doing until something changes. There's no indication in this file that Providence-Utahm changed its practices. There's been no argument made that Providence-Utahm changed its practices. You could presumably, and this would have been extrinsic evidence that would have been admissible in a district court if you had it, right? You could have tried directly to demonstrate that something like this was happening in this case, but you didn't try to do that. Well, Your Honor, obviously, the economics of ERISA cases are different than those of bad faith cases. And in the Hangar decision, there was a $5 million award, a jury verdict on punitive damages that came down the line. Obviously, there's no such potential recovery in an ERISA case. And so the likelihood that anybody is going to engage in a type of discovery in an ERISA case that they would in a bad faith case is extremely remote. And Providence-Utahm relies on that because they know that there's going to be limited discovery. There's going to be limited – there's limited penalty because – But at the end of the day, the record's a record. I mean, you say the record is this way because the economics didn't allow me to develop it, but we can't presume something is in the record that's not there. Correct, Your Honor. But as a practical matter, this is the way the record is going to develop. Well, I accept your explanation, but on the other hand, we just have to take it as it is. I'm not saying you have to buy the Hangar case. I think even as a pure abuse of discretion case, Providence handling falls. It fails to pass the test because there's no rational basis for the way it did things. You have about a minute left. Do you want to reserve some? I don't want to cut you off in mid-sentence. I've got 19 minutes. Sorry, Your Honor. Yes, I'll reserve one minute. Thank you. Good morning, Your Honors. David Weinman, a call to the helm for the defendant, defendants of Provident Life and Union Provident. I'll just refer to it as Provident Life if that's acceptable. After trial, the district court properly ruled that Provident did not abuse his discretion in discontinuing the long-term disability benefits. The trial court's order, Judge Rafiti's order, is very thorough. It reflects that the district court analyzed the briefs, analyzed the record, all the evidence that's relevant. The district court order is presumed correct, and the factual findings made therein are reviewed under the clearly erroneous standard. The recent Ninth Circuit Jordan opinion is instructive and, in a lot of ways, is right on point. Jordan v. Northrop Grumman long-term disability plan was decided after the close of briefing or at least after my brief was due or Provident Life's brief was due. But Mr. Peters provided the Jordan opinion to the court. In the – in Jordan, it discusses the abuse of discretion standard and the proper application by trial courts of the abuse of discretion standard. The – here, Provident paid short-term disability benefits to Kent. Provident paid long-term disability benefits to Kent until Mr. Kent recovered from the stent insertion surgery. And ultimately, according to Dr. Hashway, reviewing the medical records supplied by Kent's treating physicians, his heart condition at the time it was reviewed was essentially normal. The ejection fraction is not proper. But this is a man who had had years of repeated, as I understand it, episodes where his arteries became clogged and then were cleaned up in various ways with angioplasty and surgery, bypass surgery and stents, and still every time, I presume after each of these evidence – after each of these episodes, the evidence would have been the same and then there was another one. So his personal doctors both were of the view that the job stress had something to do with this, and that's not an odd understanding, is it? I mean, that's many – one would assume that many, many doctors would think that. Is that not so? I'm not sure. The – Dr. Tabak is a cardiologist. Dr. Hashway is a cardiologist. I don't believe Dr. Bradbauer is a cardiologist. Mr. Peters stated he was, but I don't think he is. He's an internist. I'm sure he's board certified, but he's not a cardiologist. This was not within his specialty. When Dr. Hashway gave his opinion, and it's a pretty thorough opinion. Well, his opinion was sort of a generic opinion, as I understand it, i.e., job stress is not a risk factor. Well, on that – It wasn't specific to this person. On that point – well, no, I disagree, Your Honor, because I disagree that the – He didn't take into account the fact that this guy had an unusual, lengthy history. This wasn't once. This was lots of times with regard to buildup of heart problems over a long period of time. That's the record. He does not address that record. I think his written report may not specifically speak to that point. It does not. I'm sure Your Honor is right on that. But I wouldn't agree that just because of that doesn't mean that Dr. Hashway didn't disagree. It was a generic statement, which is that stress is just not a factor. Well, and it's not – I don't know, you know, what the quote that matters as far as what Dr. Hashway said was that there's no – see, it's not just that job stress doesn't contribute to coronary problems or heart problems. I don't – that's not what he said. He said Dr. Bratbauer further states that, quote, the causal nexus between emotional stress and acceleration of the atherosclerotic process had been described in the scientific literature. And there was no citation support for it. But what he's talking about is a causal nexus between emotional stress and acceleration of the atherosclerotic process. And then when he says the course of the atherosclerotic disease is not typical, I assume he was referring to the same thing I'm referring to. This is an unusual situation. And then he says such statements apply – Hashway says such statements apply a risk factor for atherosclerosis, namely job-related emotional stress not recognized by any of the National Advisory Boards. And he doesn't know of any large, well-designed prospective studies that have been entertained. And thus, Dr. Bratbauer's comments go beyond the current knowledge base of the risk factors involved. That seems to me to be a generic statement, i.e., job stress is not a factor, and anybody whose doctor says he shouldn't do this job because of his heart condition and job stress is, I'm going to find against. Well, I don't know that that's true. In some ways it's generic because it's a statement within Hashway's field that Dr. Hashway is making. So certainly it's generic in that sense. But it's mainly job-related emotional distress. Sure, but let's put the question another way. Let's say you take any group of plaintiffs whose only claim for disability is based on job-related stress that might lead to cardiac problems. They're all going to get the same answer, aren't they? Regardless of what the strongest evidence that their physicians say, look, this person should not be in this situation because I believe job stress is going to accelerate the process of heart disease. They're going to get the same answer, right? I think they're not going to get the same answer if they have a different set of objective findings. I think part of Dr. Hashway's analysis has to be tied to the claim file or the claim that he was analyzing. Well, it's not Judge Berzon's point or question. It's that there's no relation or there's no analysis in this case in the finding relating it to the specific circumstances, the history and so forth. There's also no, I wouldn't accept that, but let me say something first. There's also no evidence in this case that Mr. Kent has any sort of particularly stressful job. I mean, he has a job. We all have jobs. We call them stressful. I'm sure Mr. Kent considered his job stressful. That changes with every person. I mean, there's some people who say, oh, being a judge is too stressful a job, you know, or being a janitor is too stressful a job for me. And isn't that an analysis required of me to say, I mean, you can't say, oh, yeah, being a judge is a stressful job. It may be for me, but not for 99 out of 100 other people. And isn't Unum Provident required to look at the individual and the individual circumstances and say, yes or no, yes, this is too stressful or no, it isn't, based on this individual, not based on whether there are any well-designed, long-term, I mean, all those qualifying words, studies showing that stress is related to cardiac problems. Yes, I think the company should look at somebody's claim that job stress is contributing to heart disease, but I think Dr. Hashway did look at it. It can never be. It can't be. It's got to be supported. I mean, if he had gone on to say, in this case, even in this case where there's a long history, blah, blah, blah, I don't think it has a, he didn't reach a conclusion. I'm sorry. One of the points in Jordan and all the other, in a lot of other Ninth Circuit cases, making up a risk of jurisprudence, is that the, this is an abusive discretion case. The judgment here on whether a claim is payable is committed to the sound discretion of the claims fiduciary. Now, here, it's my client. This Court is not supposed to be making a medical judgment. All right. Well, let me stop you there. Let me stop you there. If we think the standard of review is different, I mean, if you lose on the question of whether or not there was a conflict, then we have to remand for Judge Raffiti to reanalyze under a different standard, right? Yes. That's certainly possible. Yeah. If you don't think, but even under de novo standard, it doesn't mean everything starts to come in. There still are risks. The Supreme Court has told us that ERISA exists for a reason. It has resulted in a lot of fringe benefits to employees, And part of that is keeping the cost down, keeping the administrative cost down, keeping the adjudication cost down. The interesting question here is this. This person has a disease that isn't going to interfere with or has had a disease, but has the ability to do the job, except he might die. Right? In other words, he's going to be able to do the job, do the job, do the job, until something goes wrong and he could die. It's not like somebody who has a muscular problem or a bone problem or in pain or anything else. Right? So that's number one. So all of these tests that show that he's, you know, able to do the physical job aren't really responsive to the problem, which is are we going to make him work until he dies? At least that's one issue. That's factor one. Factor two is that the judgment that's being made here by the doctor is not really about what a wise physician would advise somebody. In other words, Dr. Ashway is making a judgment as if he was a researcher, but doctors don't necessarily operate that way. They have to make judgments about what they would advise their patient, given the available knowledge. And the question is, isn't it an abuse of discretion for Dr. Ashway essentially to say, because this hasn't been adequately scientifically proven, I'm — he's really not even saying what he would advise his own patient. He's just saying it wasn't adequately scientifically proven as a cause factor, you know, as if we were having a trial on liability, which is not what we're doing here. We're trying to find out what a wise doctor would tell his patient. Well, on that question, I think we're not necessarily, with all due respect, trying to find out what a wise doctor would tell his patient. I'm not saying that's irrelevant. But the test under the disability contract, and it is a contract, is not necessarily the same as what a wise — it may be in some circumstances, it may be the same. Under these circumstances where the issue is a risk of death that is not interfering with him on a daily basis. So the question is, if 95 — let's say 95 doctors out of 100, without scientific proof, but just knowing what they know from their experience as doctors, would have told this guy the same thing, even though it's not scientifically provable. What's your position on whether or not it's an abuse of discretion to nonetheless say he's not disabled and should be working? Well, you've said it's not scientifically provable, so that creates some difficulty in me responding to it. If it is — No, I'm assuming that Dr. Hashway is right. It hasn't been, you know, proven in the sense that if an expert got up and said this is the reason he died, it would survive a jury verdict. But in terms of what doctors advise people, because of the way risks are calculated by doctors, they would advise him not to be working at this job.  I will answer your question. I want to make a couple points while I'm getting to the answer. The policy — and again, it's a contract — requires certain proof of laws, certain evidence. The company has discretion under that contract to require the evidence be in the form of objective evidence. That's just a couple points to consider in doing this. And that's all — there's nothing wrong with that under ERISA law. The objective evidence here is that over and over again he developed this problem. The objective evidence is also that looking at the day of the claim, Mr. Kent physically could perform his job and didn't appear to — and the heart findings are basically all within normal limits. And I'm not intending to misspeak on that. That's essentially what Dr. Hashway is saying. And at this point in time, Dr. Tabak, the cardiologist, is not — there's no rebuttal from him. Mr. Kent or — I don't know if Mr. Kent was represented by an attorney at this point. Mr. Kent could easily — I mean, it's — the record is sort of glaring for the absence. But Dr. Tabak earlier, as I understand it, did say that stress was the reason why he got himself into this fix the last time. Dr. Tabak also said that Kent would be able to resume work at some point in time. Now, that's, you know, after — after Uniprovident. It's after the day Uniprovident believed he could return to work. But Dr. Tabak then is gone from the record and gone from our scene. And what we have is a worker's — a doctor working in the worker's comp system for another reason. It's an attorney-generated thing. But that wasn't the reason why Dr. Pashway disregarded Dr. Bradbar. Apparently, he would have disregarded anybody who said — who said the same thing. Well, I — yeah, I would concede that. His — his report — his report says what it says. And I agree that he, you know, says there's no scientific link on the — you know, between the acceleration of the arthrosclerotic process and emotional — and jobs — emotional job shift. Like one of Your Honors already pointed out, he was — Dr. Pashway was concerned with hypertension as being a — as being a risk factor. What he's saying here is non-job stress, under — job stress. Under Jordan, it's very — I think it's very important that we don't have anything from the cardiologist, Dr. Tabak, who was the initial treating cardiologist, and apparently for a long period of time. And yet he says nothing in response to Dr. Pashway. And if Dr. Pashway was so, quote, unquote, full of it, which is essentially, you know, I'm — sorry, I'm moving into the slang, but that's, you know, under the hypothetical or that's one characterization of it anyway, you know, where is the rebuttal from Dr. Tabak? It seems like it would be pretty easy to have. She goes back again. The problem here is that Dr. Pashway didn't say that this guy's job stress, given his job and given his history, wasn't sufficient. He said job stress is never sufficient. I'm not — that's true. That's what he said. I'm not sure he was in any position, given the state of the record, to — he didn't have any information about particular stress. Well, he didn't need any. From Kent's job. He didn't need any. He already made up his mind that job stress could never be related to heart disease. But there's nothing — I think if there's something in the record that — where somebody has some specific concrete evidence of Kent — of Mr. Kent having an angina or something like that or having to get medical treatment because of something that happened on the job, and there's medical evidence supporting that, I have to believe — Well, but you do have the work restriction, which is — that says put him in a low-stress job, which is — you know, physicians don't make work restrictions lightly. And — Right. They don't impose those lightly. Well — And whether it's — you know, there's — Sorry to interrupt. I mean, not to get into the, you know, the medical aspect of it, but in fact, I mean, you can make an argument that stress doesn't accelerate to the positive plaque, but you can also make a — in the arteries, but you can make a pretty good argument that it does increase the risk of some event, either a heart attack or some other problems with the heart. Well, these — I mean, there's a risk for — you're talking sort of apples and oranges on what can happen with the heart under stress, it seems to me. You can't just generically say stress isn't related to heart problems and, you know, I think deny a whole class of claims. I don't think a whole class — I think that's taking this one thing and just running with it for advocacy reasons, not by the panel, but by the attorneys, and just, you know, and saying that. I just — I don't see that — there's no example of that. They're saying Kent fits into that, but I don't think so. I'm sorry, but I just don't read what he wrote that way. Tell me why I should read what he wrote in that fashion. In what fashion? I'm sorry. As not being a generic statement that stress is not related to heart disease, period, the end. There's nothing specific. Show me something specific to Kent in that statement. Well, I can't unless it's in the report, and I'm not — I don't think that job stress specific to Kent is in the report. I think I haven't answered one of your questions, which was something like 95 out of 100 treating physicians being a wise physician would tell their patient, don't go to work. Right. That's not the test under the disability contract. Really? In other words, that people should go to work even though 95 out of 100 doctors, in their wisdom as doctors, would say that you're at risk of death if you do it. No. No. The converse — I don't — I mean, I don't think the converse of what I said is necessarily true at all times either. The Nord — the Black and Decker versus Nord case, I can't remember — I think Black and Decker comes first. The U.S. Supreme Court case said a little bit, you know, watch out for treating physicians and their opinions regarding inability to work, because they're going to be biased in favor of their patients. And a wise physician may say, you have $250,000 in the bank. You have a half-a-million-dollar equity in your home. You shouldn't — Now, let's take to my head. 95 out of 100 doctors with poor patients would still tell them not to do this. Right? There's circumstances that are — what I have to say on that is that the policy requires objective evidence. There's nothing wrong with the policy requiring objective evidence. I don't think a wise — of serious heart problems. All of — during all of which he worked. Right. And maybe that's why he kept getting it back again. I — you know, it could be. That's not answered in the record. That — this is — it goes back to what I'm saying about Dr. Tabak not contributing to the record after a certain point at all. And we don't — the only card — Unum Provident Life asked a cardiologist to look at it. That's the proper specialty. It's very significant under the Jordan case and other cases. And it was not met with a cardiologist in response. And what Dr. Hashway is saying — And is it of any significance that several different courts have reversed around that Dr. Hashway and gave no consideration to the demands in place of the accusation on a specific question? It's not — yes, it has some significance. It should not count as other act or other bad act evidence against Dr. Hashway or — against Provident Life. I'm sure it should have some significance, and so should the fact that there are cardiology cases where Dr. Hashway has given an opinion upon which the company relied to stop paying benefits, where the decision was upheld. What about this particular opinion, though, the opinion that stress is not a relevant factor? Well, I'm — I don't think there — it's not my recollection that those other cases, Cunningham and the other cases — Oh, they were. Dr. Cunningham. Cunningham and Schiff. As Vice President of Sales and Marketing might exacerbate his already precarious condition, and that was an abuse of discretion to consider the stresses associated with plaintiff's occupation. All right. For example. That's one. I don't know if there may be others, but that's one. You're — that's coming — that is coming back to me. I think Dr. Cunningham — I think Cunningham had a 17 percent, something like that, very low left ventricle ejection fraction. And I think the objective evidence is different in those cases. They're both Dr. Hashway, but I think the objective evidence is different. I mean, we're dealing with our case here. Mr. Kent's objective evidence just does not get to the level of what I recall about Cunningham's. And I think it was Cunningham, if it was a physician, there's — a lot of times there's a consideration in the doctor cases about whether it's safe for the physician to practice, to do surgery when they have these conditions, which doesn't apply here. There's — under Jordan, there is substantial — it's an — viewed as an abuse of discretion case, and the policy confers discretion on you in Providence. But there is substantial evidence in the administrative record supporting the decision that's being challenged here. You're a little over your time. Any concluding remarks you want to make? If Your Honors have questions, more questions, I'd be happy to answer them. Any further questions from the panel? Thank you, Counsel. Okay. Thank you. Just a couple of quick remarks. Dr. Hashway seems to draw some distinction between hypertension and job stress. I'm not sure how one does that, since it's my understanding that job stress creates hypertension, but he appears to have this mental distinction between the two of them. I don't understand how he can do that. In his letter regarding Dr. Bratbauer's analysis, he says — in his analysis, Dr. Bratbauer acknowledges the presence and the claim of the universally recognized risk factors for coronary heart disease, including hypertension, history of smoking, and hypercholesterolemia, indicating to me that hypertension is accepted as a risk factor. I do not know what the distinction between job stress and hypertension is, but it seems to me that hypertension is a result of stressors, and that job stress is a stressor. I believe that, really, Provident does have the position they want professionals to suffer from cardiac disease to work until they die, either retire without a complaint or work until they die, and that's not what CIBC paid tens of thousands of dollars for, and certainly not what Mr. Kent signed up for when he became employed by CIBC, that a day would come when he would risk either working or dying. He would die if he worked, and yet his disability benefits would give him nothing. Moving on to a couple quick points. Dr. Tavich said in his initial report that Mr. Kent could return to work if he recovered. There was no definitive statement that he could return to work, period. And the more significant thing is, if you're going to deny somebody's claim, whose obligation is it to create a sufficient record for the denial? If we're going to complain that Dr. Hashway didn't know anything about Mr. Kent and, therefore, couldn't make an individual analysis, whose fault is that? It's Provident Eudem's burden to find out the information to make an individual analysis. Kagan. I mean, you have to make a claim which establishes your claim. Correct. And, in fact, in his initial claim, Mr. Kent gave a description, about a 20 or 30-word description of his illness. Provident Eudem did nothing to follow up on that description. They did not solicit any information from him. They did not interview him. They did not do a vocational search. They did at one point refer it to a psychologist who essentially said, gee, I don't know. I'm going to leave this to the cardiologist and send it back to Dr. Hashway. So there is nothing in the record to indicate that Provident Eudem did anything to find out, as to Mr. Kent, what his job was, what the stresses were, and why stress might cause heart disease in his particular case. And I believe that was their obligation. And I really think what happens here is that Provident Eudem has come across a scheme that they can just deny an entire class of claims. Anybody who is a professional whose job is not to lift heavy weights, who has cardiac disease, gets lumped into the can they perform a sedentary job. And by definition, if you can lift a 10-pound weight, you can perform a sedentary job. You're out of the park. Claim denied. End of game. With that, thank you. Thank you very much for your arguments. The case just heard will be submitted. The final case on the oral argument calendar, Baskin v. CCH, was submitted on the briefs. Recess. We'll be in recess for the morning.
judges: Thomas, Berzon, Mahan